**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SYED ABBAS,                     )
                                )
               *Plaintiff*,       )     No. 23 C 1691
     v.                    )
                                  )     Judge Virginia M. Kendall
PAGE STREET PROPERTIES LLC, et al.,   )
                                  )
           *Defendants*.     )
                                  )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Syed Abbas claims Defendants Laurena "Lori" Mikosz and Marcin Chojnacki tricked him into buying two run-down apartment buildings. While holding themselves out as Abbas's real-estate brokers, Mikosz and Chojnacki allegedly fed him false assurances about the buildings' condition and profitability. Behind the scenes, Mikosz's and Chojnacki's associates, the remaining Defendants, through "puppet entities," bought the buildings and resold them to Abbas at a significant markup. Abbas sued, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 1). Defendants now move to dismiss. (Dkt. 55). For the reasons below, the motion [55] is denied.

## BACKGROUND

In November 2021, Plaintiff Syed Abbas, a California resident, saw an advertisement on social media for CitiPoint Properties ("CitiPoint"). (Dkt. 1 ¶ 26).[1] According to the advertisement, CitiPoint helped real-estate investors find "undervalued and underperforming properties"—so-called "directly sourced" properties. (*Id.* at ¶¶ 26–27). The advertisement promised "rapidly

---

[1] At the time, CitiPoint was an "unincorporated enterprise," organized by Defendant Marcin Chojnacki, that appeared to be a real-estate investment firm. (*Id.* at ¶ 19). Later, on December 28, 2022, CitiPoint reorganized as Citypoint Illinois, LLC, which is owned and controlled by nonparty Citypoint Group, Inc. (*Id.*)

increasing equity and high cash flow." (*Id.* at ¶ 26). Responding to the advertisement, on November 10, Abbas sent a message to CitiPoint. (*Id.* at ¶ 28). Chojnacki replied from Illinois, and the two developed "sustained text and phone interactions" about CitiPoint. (*Id.* at ¶ 29; Dkt. 1-1).

Chojnacki invited Abbas to a Zoom meeting with himself and Defendant Lori Mikosz. (*Id.* at ¶ 31; *see* Dkt. 1-1). During this meeting, Mikosz and Chojnacki introduced themselves as real-estate brokers for Chase Real Estate LLC ("Chase RE"), an affiliate of CitiPoint. (*Id.* at ¶ 31). They explained that Abbas could purchase underperforming buildings directly from local "mom and pop landlords" on the verge of retirement. (*Id.* at ¶ 34). Mikosz and Chojnacki led Abbas to believe that they would represent him as agents and brokers of Chase RE, and "the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate." (*Id.* at ¶¶ 32, 35). At the time, the CitiPoint website was "a virtual reflection" of Chase RE's website. (*Id.* at ¶ 33).

Mikosz and Chojnacki sent Abbas information about two apartment buildings, which Abbas later purchased: 12925 Page Street, Blue Island, Illinois (the "Page Property") and 1017–1021 West Columbus Drive, East Chicago, Indiana (the "Columbus Property"). (*Id.* at ¶¶ 30, 53).

*First*, Chojnacki sent Abbas a link to a page on the CitiPoint website, which showed that the Page Property had a positive cash flow and was fully rented. (*Id.* at ¶ 30). The webpage promised even greater cash flow if the investor used Chojnacki's property-management company, Mainstreet Property Management ("Mainstreet"). (*Id.*) Mikosz and Chojnacki further represented that the Page Property was in good condition, fully leased, and would be profitable if Abbas purchased it from the retiring "mom and pop" seller for the "bargain" price of $525,000. (*Id.* at ¶¶ 37, 40). When Abbas inquired about the cost of potential repairs through text message, on December 9, 2021, Mikosz replied "$0. No need to do any repairs. 0$." (*Id.* at ¶ 44; Dkt. 1-5). During their dealings, Mikosz and Chojnacki "continued to describe [themselves] to Abbas as his

real estate agent[s] and representative[s]." (Dkt. 1 ¶¶ 49–50). Relying on Mikosz and Chojnacki's representations, Abbas entered an agreement to purchase the Page Property on November 13, 2021. (*Id.* at ¶ 51).

*Second*, by email dated November 16, 2021, Mikosz and Chojnacki asked Abbas to invest in the Columbus Property, another property purportedly owned by a retiring "mom and pop" landlord. (*Id.* at ¶¶ 53, 55; Dkt. 1-4). Mikosz and Chojnacki provided a detailed cash-flow analysis showing that the property would be profitable at a purchase price of $612,000. (*Id.* at ¶ 56). In a text-message exchange on December 8, 2021, Mikosz told Abbas that the seller had offered a $15,0000 closing credit, which Mikosz thought was "fair as we got a big discount already from the purchase price." (*Id.* at ¶¶ 58–60; Dkt. 1-7). In the same exchange, Mikosz said the property was in good condition, writing, "[a]t the moment, no need for repairs except for touch ups." (Dkt. 1 ¶ 61; Dkt. 1-7). Believing Mikosz and Chojnacki, Abbas entered an agreement to purchase the Columbus Property on November 17, 2021. (*Id.* at ¶ 62). Chase RE received a commission of $18,375.00 from the closing on both Properties. (*Id.* at ¶ 73).

Throughout the dealings with Abbas, Defendant Rebecca Irwin acted on behalf of Defendants Grand Columbus EC LLC ("Grand Columbus"), Page Street Properties LLC ("Page Street"), and Midwest Title and Closing Services LLC ("Midwest Title"). (*Id.* at ¶ 80). Through Midwest Title, Irwin provided "registered agent services to the various puppet entities"; she housed "various legal operations" relating to the entities and deals; and she charged Abbas a fee for "closing coordination." (*Id.* at ¶ 81). Midwest Title—managed by Irwin and nonparty XYZABC, Inc., of which Irwin is the president—shares office space with Irwin, Chojnacki, Mikosz, Mainstreet, Defendant Robert Rixer and Defendant EJ Investment Group Inc. ("EJ Investment"), which manages Mainstreet. (*Id.* at ¶¶ 13–16, 82).

After purchasing, Abbas learned that neither Property was owned by a "mom and pop" seller. (*Id.* at ¶ 76). Nor were the purchase prices a "bargain." Page Street—managed by Defendant TCF National Holdings, Inc. ("TCF National"), which is owned and controlled by Chojnacki's roommate and "paramour" Defendant Kathleen Long—purchased the Page Property for $380,000 in December 2021, and resold it to Abbas for $525,000. (*Id.* at ¶¶ 6–7; 71–72). Another entity, Grand Columbus—owned and managed by Illinois Assets LLC, which Chojnacki and Rixer own and control—purchased the Columbus Property for approximately $500,000 in May 2021 and resold it to Abbas for $612,000. (*Id.* at ¶¶ 9–10, 62, 76–77).

To boot, neither property was fully leased nor current in rent; instead, both buildings were partially vacant with multiple tenants in eviction proceedings or arrears. (*Id.* at ¶ 68). Abbas has needed to pursue "numerous" additional eviction proceedings against delinquent tenants. (*Id.* at ¶ 89). Abbas has also discovered that Defendants did not follow Blue Island inspection and real-estate transfer requirements, and the Properties were not up to building code. (*Id.* at ¶ 87). As a result, Abbas has incurred fines and citations. (*Id.* at ¶ 88). He has also needed to perform "significant repairs at a substantial expense." (*Id.* at ¶ 112). Despite these issues, Defendants, through Mainstreet, have charged Abbas for unexplained costs and withheld any funds that tenants have paid. (*Id.* at ¶ 90). Defendants have also tried to "repeat the scam" by offering Abbas additional properties. (*Id.* at ¶ 91). Defendants have allegedly scammed at least four other investors like Abbas. (*Id.* at ¶¶ 92–93).

On January 10, 2023, Abbas confronted Chojnacki by email: "You bought these buildings at a discount and sold them to me at a premium, all while making a commission in the process. Isn't that correct?" (*Id.* at ¶ 66; Dkt. 1-9). "Not correct," Chojnacki responded:

> [O]ur brokers work with various types of sellers. Mom and Pops, other RE investors/corps, asset manager, credit unions etc. Each of these sellers have

different property histories and different motivations for selling. What matters to us is the sale price and if we see value in the deal for the buyers.

(*Id.*)

Abbas filed this suit in March 2023. (Dkt. 1).[2] In Count I of the Amended Complaint, Abbas alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), (d). (Dkt. 1 ¶¶ 94–114). Count II is a common-law fraud claim against Mikosz, Chojnacki, and Irwin. (*Id.* at ¶¶ 115–21). Count III alleges Mikosz, Chojnacki, Long, and Irwin violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.* (*Id.* at ¶¶ 122–28). Then, Count IV alleges that Mikosz, Chojnacki, and Chase RE violated the Illinois Real Estate License Act (IRELA), 225 ILCS 454/1 *et seq.* (*Id.* at ¶¶ 129–35). In Count V, Abbas brings a negligent-misrepresentation claim against Mikosz, Chojnacki, Long, and Irwin. (*Id.* at ¶¶ 136–42). Finally, Count VI is an unjust-enrichment claim against all Defendants. (*Id.* at ¶¶ 143–47). Chase RE, joined by the remaining Defendants, moves to dismiss the Complaint for failure to state a claim. (Dkt. 55; *see also* Dkts. 57–60).

## LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[2] This is one of eleven related actions proceeding before this Court. *See* Amended Complaint, *Malik v. Prairie Raynor LLC*, No. 23-cv-01182 (N.D. Ill. Mar. 2, 2023); Complaint, *Shankar v. Fairview Ave. Props. LLC*, No. 23-cv-01469 (N.D. Ill. Mar. 9, 2023); Complaint, *Sor v. TCF Nat'l Holdings, Inc.*, No. 23-cv-02401 (N.D. Ill. Apr. 18, 2023); Complaint, *Chen v. Chojnacki*, No. 23-cv-02520 (N.D. Ill. Apr. 21, 2023); Complaint, *Michel v. Chojnacki*, No. 23-cv-02546 (N.D. Ill. Apr. 24, 2023); Complaint, *Said v. Chojnacki*, No. 23-cv-02858 (N.D. Ill. May 5, 2023); Amended Complaint, *Haynes v. Fairview Ave. Props. LLC*, No. 23-cv-01596 (N.D. Ill. May 16, 2023); Complaint, *Stafford v. Chojnacki*, No. 23-cv-03173 (N.D. Ill. May 19, 2023); Complaint, *Hui v. Chojnacki*, No. 23-cv-03430 (N.D. Ill. May 31, 2023); Complaint, *Fernandez v. Chojnacki*, No. 23-cv-04406 (N.D. Ill. July 7, 2023).

544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

## DISCUSSION

## I.    Racketeer Influenced and Corrupt Organizations Act (RICO) (Count I)

In Count I, Abbas alleges that Chojnacki, Mikosz, Page Street, Grand Columbus, and Citypoint Illinois (collectively, "the § 1962(c) Defendants") violated § 1962(c), (Dkt. 1 ¶¶ 94–104), while the remaining Defendants Long, Irwin, Midwest Title, EJ Investment, Mainstreet, Chase RE, TCF National, Rixer, and Illinois Assets (collectively, "the § 1962(d) Defendants") violated § 1962(d), (*id.* at ¶¶ 105–10). Defendants challenge Abbas's claims under both subsections. Before diving into the RICO allegations, it is worth noting that the complaints in the ten related cases pending before this Court—all describing similar schemes to defraud other plaintiffs by the same or similar defendants[3]—give Abbas's claims a plausibility boost. *See Pirelli*

---

[3] *See* Amended Complaint, *Malik*, No. 23-cv-01182; Complaint, *Shankar*, No. 23-cv-01469; Complaint, *Sor*, No. 23-cv-02401; Complaint, *Chen*, No. 23-cv-02520; Complaint, *Michel*, No. 23-cv-02546; Complaint, *Said*, No. 23-cv-02858; Amended Complaint, *Haynes*, No. 23-cv-01596; Complaint, *Stafford*, No. 23-cv-03173; Complaint, *Hui*, No. 23-cv-03430; Complaint, *Fernandez*, No. 23-cv-04406.

*Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011)

("It is appropriate to accord limited corroborative weight to allegations in another's lawsuit.").

### A.     Section 1962(c)

Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964(c) "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)). To state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *accord Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017).

### 1.     Conduct of an Enterprise

A plaintiff's first step under § 1962(c) is to identify an "enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). An "enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Walgreen*, 719 F.3d at 853 (observing that the statutory definition of "enterprise" is construed broadly). An "association-in-fact" enterprise has "three structural features: [1] a purpose, [2] relationships among those associated with the enterprise; and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *Sabrina*, 869 F.3d at 588. Put simply,

this type of enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Separate from the RICO enterprise, the plaintiff must point to a "person"—that is, the defendant. *Walgreen*, 719 F.3d at 853 (citing *Cedric Kushner*, 533 U.S. at 161); *see also Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). "[T]hat 'person' must have conducted or participated in the conduct of the *enterprise's* affairs, not just its own affairs." *Walgreen*, 719 F.3d at 854 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (cleaned up). In this context, conduct refers to a defendant's operation or management of the enterprise. *See Sabrina*, 869 F.3d at 589 (citing *Reves*, 507 U.S. at 179).

Here, Abbas has sufficiently pleaded an association-in-fact enterprise with purpose, relationships, and longevity. He alleges that the § 1962(c) Defendants—which no one disputes are RICO "persons"—"were associated in fact" as the "CitiPoint Enterprise." (Dkt. 1 ¶¶ 95–96). That enterprise's "primary purpose . . . was to lure and then fleece unsuspecting real estate investors" for financial gain. (*Id.* at ¶ 97). To ensure the CitiPoint Enterprise's profit at the expense of investors like Abbas, its members allegedly worked on both sides of real-estate transactions. Mikosz and Chojnacki worked together from their shared office, doing business as CitiPoint (later, as Citypoint Illinois). After drawing Abbas in with promises of too-good-to-be-true investment opportunities, Mikosz and Chojnacki purported to represent Abbas as real-estate brokers in his purchase of the Properties. Mikosz and Chojnacki stressed to Abbas that they would handle everything, and they encouraged Abbas to trust their numerous and repeated misstatements about the Properties' condition and profitability. After Abbas agreed to buy both Properties for $1.137

million, Chojnacki, his co-owner Rixer, and his paramour and roommate Long, through Grand Columbus, Page Street, Illinois Assets, and TCF National, bought the Properties for $880,000 and resold them to Abbas at a $257,000 profit. Behind the scenes, Irwin pulled the strings on the complex web of "puppet entities" that helped shield the conflicts of interest from view. (*Id.* at ¶ 81).

The sophisticated coordination and relationships among Defendants on both sides of Abbas's purchase reflect "an unusual degree of economic interdependence" that helps nudge the existence of the CitiPoint Enterprise across the plausibility threshold. *See Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015); *see also, e.g.*, *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384, 388–89 (7th Cir. 2010) (holding that the plaintiff adequately alleged an enterprise by pointing to a coordinated fraudulent scheme); *cf. Walgreen*, 719 F.3d at 855 ("RICO does not penalize parallel, uncoordinated fraud." (citing *Boyle*, 556 U.S. at 947 n.4)). Indeed, that coordination appears essential to the success of the alleged scheme. Rather than "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest," therefore, the CitiPoint Enterprise looks more like a "truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *See Bible*, 799 F.3d at 655–56. Moreover, the alleged CitiPoint Enterprise lasted long enough for its members to pursue the enterprise's purpose of attracting investors and profiting from their purchases. *See Walgreen*, 719 F.3d at 853 (citing *Boyle*, 556 U.S. at 946). After Abbas closed on the Properties, Defendants continued to offer him additional properties and, through Mainstreet, charged him for unexplained costs and withheld tenant funds. Defendants have allegedly scammed at least four other investors like Abbas.

Defendants contend that Abbas has failed to plead a distinct enterprise because there is "complete identity between the alleged 'persons' and the alleged members of the 'enterprise.'" (Dkt. 56 at 6); *see Baker*, 357 F.3d at 692. This argument rests on the mistaken view that an enterprise's members cannot be named as defendants. Of course, an entity cannot be liable under RICO for "operat[ing] *itself* unlawfully." *See Baker*, 357 F.3d at 691–92; *Walgreen*, 719 F.3d at 854; *see also Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 747 F.2d 384, 402 (7th Cir. 1984), *aff'd on other grounds*, 473 U.S. 606 (1985). Yet, a plaintiff may state a RICO claim against each member of an association-in-fact enterprise. *See Haroco*, 747 F.2d at 401 ("Where persons associate 'in fact' for criminal purposes . . . each person may be held liable under RICO for his, her, or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity.").

To satisfy RICO's distinctness requirement, the enterprise can "be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization)" separate from the "person." *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985); *see also Cedric Kushner*, 533 U.S. at 162–63 ("The corporate owner/employee, a natural person is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." (citing *McCullough*, 757 F.2d at 144)). Abbas's allegations suggest that the CitiPoint Enterprise is distinct from each of the § 1962(c) Defendants who served as members. Unlike the enterprise's members—who are "persons," capable of holding property—the CitiPoint Enterprise is a network of individuals and entities, associated in fact, and thus unable to "hold any interest in property or even be brought into court." *See Haroco*, 747 F.2d at 401. Accordingly, Abbas has alleged the existence of a distinct enterprise.

Abbas has also plausibly alleged that the § 1962(c) Defendants participated in operating or managing the CitiPoint Enterprise's affairs. *See Sabrina*, 869 F.3d at 589 ("[T]o satisfy the 'conduct' element, a plaintiff must allege that the defendant participated in the operation or management of the enterprise itself, and that the defendant played some part in directing the enterprise's affairs." (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727–28 (7th Cir. 1998))) (cleaned up); *Reves*, 507 U.S. at 179; *see also Bible*, 799 F.3d at 657. The precise hierarchy of the CitiPoint Enterprise may be unclear. Yet, Abbas has alleged that Chojnacki and Mikosz, through Citypoint Illinois, attracted and purported to represent unwitting investors while Chojnacki, Long, and Rixer, through Grand Columbus, Page Street, Illinois Assets, and TCF National, purchased and resold properties to those investors. These allegations permit a reasonable inference that the § 1962(c) Defendants held leadership roles and took part in directing the enterprise.

### 2.      Pattern of Racketeering Activity

A pattern of racketeering activity requires the completion of at least two predicate acts within ten years. *Bible*, 799 F.3d at 659; 18 U.S.C. § 1961(5). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (cleaned up); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity is 'centrally a temporal concept.'" *Empress*, 831 F.3d at 828 (quoting *H.J.*, 492 U.S. at 242). Analytically, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past

11

conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J.*, 492 U.S. at 241).

While Defendants do not challenge Abbas's satisfaction of the relationship-plus-continuity test, they argue that Abbas has failed to adequately plead predicate acts. (Dkt. 56 at 7–10). As predicate acts, Abbas alleges mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (Dkt. 1 ¶¶ 100–01). "The elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657 (quoting *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003)) (cleaned up); 18 U.S.C. § 1341. Wire fraud has the same elements, except that the defendant must use interstate wires instead of mail to further the scheme. *Bible*, 799 F.3d at 657 (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011)); 18 U.S.C. § 1343.

Abbas's allegations of mail and wire fraud are subject to Rule 9(b)'s particularity requirement. *See Bible*, 799 F.3d at 658; Fed. R. Civ. P. 9(b). At a minimum, therefore, Abbas must "describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Bible*, 799 F.3d at 658 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)). Yet, Rule 9(b) does not demand "form for form's sake": "although 'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Pirelli*, 631 F.3d at 442 (internal quotation omitted). The requisite level of detail may vary from case to case. *Id.* (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)). Since

12

"fair notice is the 'most basic consideration underlying Rule 9(b),' in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)).

Abbas alleges that "Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in 'directly sourced' real estate opportunities." (Dkt. 1 ¶ 101(a)). Yet, Defendants "actually intended to sell the duped investor their own significantly marked-up property." (*Id.*) Abbas alleges further that Defendants engaged in a "sustained fiction," "replete with misrepresentations and calculated omissions" to mislead Abbas into believing that he could buy property from an "old retiring couple" at a bargain. (*Id.* at ¶ 101(b)). Abbas's RICO Count incorporates his previous, more detailed allegations. (*See id.* at 15). While some of these allegations lump Defendants together, others describe the "who, what, when, where, and how" of the fraud.

In November 2021, using wired communication, Chojnacki replied to Abbas's response to a social-media advertisement for CitiPoint (now Citypoint Illinois). (*Id.* ¶¶ 26–29). From Illinois, Chojnacki sent Abbas, in California, a link to CitiPoint's website with information about the Page Property. (*Id.* at ¶¶ 29–30). In a subsequent Zoom meeting, Mikosz and Chojnacki told Abbas that CitiPoint could help him buy underperforming real estate from "mom and pop" property owners and make "substantial cash flow" with proper management. (*Id.* at ¶¶ 31–34, 38). They repeatedly told Abbas that they would serve as his agents and brokers, helping him at every stage of the transaction. (*Id.* at ¶ 35). On December 8, 2021, Mikosz sent a text message to Abbas that the Columbus Property's "seller" had offered a $15,000 closing credit, which Mikosz thought was "fair as we got a big discount already from the purchase price." (*Id.* at ¶¶ 58–60; Dkt. 1-7). She

13

also told Abbas that there was "no need for repairs except for touch ups." (Dkt. 1 ¶ 61; Dkt. 1-7). Abbas alleges Mikosz and Chojnacki made these false statements with intent to defraud him. (Dkt. 1 ¶¶ 43–46, 57–61, 101); *see Bible*, 799 F.3d at 658 (observing that fraudulent intent "may be alleged generally" (citing Fed. R. Civ. P. 9(b))). Believing the seller was a "mom and pop" landlord, Abbas went through with the purchase. (*Id.* at ¶ 62). But in truth, the seller was Grand Columbus, owned and controlled by Chojnacki and Rixer through Illinois Assets. (*Id* at ¶ 76). The price was not "discounted" because Grand Columbus purchased the property for about $500,000 and sold it to Abbas for $612,000. (*Id.* at ¶¶ 75, 77). And Abbas incurred "substantial" costs for repairs. (*Id.* at ¶ 113).

Long, using Page Street and TCF National, and Chojnacki and Rixer, using Grand Columbus and Illinois Assets, participated in the alleged fraud by purchasing the Properties in May and December 2021. (*Id.* at ¶¶ 6–7, 9–10, 23–24, 51, 71, 77). Considering Long's relationship with Chojnacki, it is plausible to infer that she—and by extension, her LLCs—contributed to the scheme with fraudulent intent. Since Chojnacki owner and controlled Grand Columbus through Illinois Assets, these entities' fraudulent intent is likewise plausible. Thus, Abbas's well-pleaded allegations add up to at least two plausible instances of wire fraud—a sufficient pattern of racketeering activity. *See Empress*, 831 F.3d at 827 ("Each use of the wires can be an individual count of wire fraud and an individual RICO predicate for the purpose of establishing two predicate acts.").[4] Accordingly, Abbas's § 1962(c) claim survives.

### B.     Section 1962(d)

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To state a claim under

---

[4] Abbas alleges that "[t]he CitiPoint Enterprise conducted its racketeering activity, in part, . . . through the mailing of checks." (*Id.* at ¶ 99).

§ 1962(d), a plaintiff "must allege that the defendant (1) agreed to maintain an interest in or control of an enterprise, or to participate in an enterprise's affairs, (2) through a pattern of racketeering activity, and (3) that the defendant agreed that some member of the conspiracy (not necessarily the defendant herself) would commit at least two predicate acts in furtherance of those goals." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017) (citing *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)). Subsection (d)'s concern is "the agreement to participate in an endeavor, which if completed would violate a substantive provision of the Act." *Id.* (citing *Goren*, 847 F.3d at 731–32); *see also Empress*, 831 F.3d at 822–23 ("As with any conspiracy, a RICO conspirator 'must intend to further an endeavor which, if completed, would satisfy all elements of a substantive criminal offense, but it suffices that he would adopt the goal of furthering or facilitating the criminal endeavor.'" (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997))); *Domanus*, 847 F.3d at 479. Here, that substantive provision is subsection (c).

Defendants argue that Abbas's § 1962(d) claim fails because his § 1962(c) claim is deficient. (Dkt. 56 at 5–6); *see, e.g.*, *Patel v. Mahajan*, 2012 WL 3234397, at *5 (N.D. Ill. Aug. 6, 2012) ("When a § 1962(c) claim fails, a § 1962(d) claim premised on the same facts fails as well." (collecting cases)). Yet, Abbas has stated a claim under § 1962(c). Defendants raise no other arguments against Abbas's § 1962(d) claim, and the Court declines to invent arguments on their behalf. *See Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel." (quoting *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011))). Thus, Count I may proceed in its entirety.

## II.        State-Law Claims (Counts II–VI)

In Abbas's remaining claims under state law, he alleges common-law fraud (Count II); violation of the ICFA (Count III); violation of the IRELA (Count IV); negligent misrepresentation (Count V); and unjust enrichment (Count VI). (Dkt. 1 ¶¶ 115–47). With scant citations to caselaw, Defendants contend that Counts II through V sound in fraud, and these claims fail to meet Rule 9(b)'s heightened pleading requirement "for the same reasons" as Abbas's RICO claim. (Dkt. 56 at 10–12). In the same vein, Defendants point out that Abbas's unjust-enrichment claim is "tied to the fate" of his other claims. (*Id.* at 12 (quoting *Vanzant v. Hill's Pet Nutrition*, 934 F.3d 730, 740 (7th Cir. 2019))); *see Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) ("Under Illinois law, there is no stand-alone claim for unjust enrichment."). Again, Abbas has stated a RICO claim, and the Court need not invent arguments for Defendants. *See Hicks*, 871 F.3d at 531. By failing to develop further arguments on the sufficiency of Abbas's state-law claims, Defendants have waived any arguments they might have made. *See Wernstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005); *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

## CONCLUSION

For the reasons above, Defendants' Motion to Dismiss [55] is denied in its entirety. Abbas's claims in Counts I–VI may move forward consistent with this Opinion.

Virginia M. Kendall
United States District Judge

Date: December 6, 2023

16