**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SYED ABBAS, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 23 C 1691 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, | ) | |
| *et al*., | ) | |
| | ) | |
| *Defendants*. | | |

# MEMORANDUM OPINION & ORDER

California resident Syed Abbas brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 133). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, two separate sets of Defendants filed motions for summary judgment against Abbas: Defendant Kathleen Long (Dkt. 240) and Defendant Marcin Chojnacki along with related entities[2] (Chojnacki Defendants) (Dkt. 242). In this case, Plaintiff's Amended Complaint alleged that the

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.

[2] The Chojnacki Defendants include at least Marcin Chojnacki, Robert Rixer, and the following entities: City point Illinois LLC; EJ Investment Group, Inc.; Grand Columbus EC LLC; Illinois Assets LLC; Mainstreet Property Management LLC; Page Street Properties, LLC; and TCF National Holdings, Inc. (Dkt. 243 at 1 n.1). That said, other filings on this docket indicate a different grouping of Defendants: Marcin Chojnacki; Robert Rixer; 11902 Longwood LLC; 1630 N 1 LLC; Citypoint Illinois LLC; Deodar, Evergreen, & Butternut EC LLC; EJ Investment Group, Inc.; Fairview Avenue Properties LLC; Grand Columbus EC LLC; Harlem Elmwood LLC; Illinois Assets LLC; Mainstreet Property Management LLC; Page Street Properties, LLC; TCF National Holdings, Inc.; Torrence 2 LLC; and, Mon Ami TCF LLC. (Dkt. 260 at 1 n.1).

Chojnacki (as well as some of the Chojnacki entities) violated 18 U.S.C.§ 1962(c), (d), and that Long (as well as other Chojnacki entities) violated 18 U.S.C.§ 1962(d). (Dkt. 133 ¶¶ 125–145). This is a distinct choice from other related cases, such as *Malik*, where the Plaintiff alleged that the Long Defendants violated "§ 1962(c), (d)." In their Response, however, Plaintiffs' attorneys spend more time rambling through the general grievances animating the 15 related cases than focusing on the specific facts (anchored in the record) as they relate to the Chen Plaintiffs themselves. In doing so, they group the Long Defendants in with the Chojnacki Defendants in their discussion of § 1962(c), (Dkt. 254 at 13–19), seemingly forgetting that nowhere did they allege the Long Defendants to have violated § 1962(c).

It is a well-established principle that "a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (citing *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014)). Plaintiffs' Response makes zero reference to a single element of § 1962(d), instead exclusively focusing on § 1962(c) and grouping the Long Defendants in with the other defendants in this case. After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Thus, the Court strikes Plaintiffs' Response to the extent it makes § 1962(c) arguments as to the Long Defendants.

That leaves the remaining motions, which are resolved on the substance. The Chojnacki Defendants' Motion for Summary Judgment (Dkt. 242) and Long's Motion (Dkt. 240) are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed

under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants Long's Motion on Counts III, V, and VI. The Court also grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

## BACKGROUND

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible

evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the relevant facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

## II. The Abbas Connection

With that, the Court turns to the facts that connect Abbas and this complicated web of actors. Abbas reached out Chojnacki via Facebook Messenger expressing his interest in multi-family property investment on November 9, 2021, after seeing Chojnacki—his former high school acquaintance—post on the site about real estate investing. (Dkt. 250 ¶¶ 13–14). Abbas asked, "how passive would this be?" and Chojnacki responded, "it can be 100% passive (minus a few communication threads) if you use management. Citipoint.org. Let's sit down and chat about all aspects of it." (Dkt. 260 ¶ 15). The two had a Zoom conference to discuss investing four days later that Mikosz joined. (Dkt. 250 ¶ 15; Dkt. 260 ¶¶ 54–55). Abbas testified that during this Zoom, Chojnacki, explained to him that Citypoint's business model was to buy undervalued properties, raise the rent, and get the properties cash-flowing, and that if he were to invest, it would be very hands-off for him. (Dkt. 250 ¶ 16).

During the call, 12925 Page St., Blue Island, Illinois (the "Page" property) came up as a potential investment opportunity and Abbas signed a purchase agreement that day for $525,000 in

"as is" condition. (Dkt. 250 ¶¶ 17–18). In the interim, Abbas created "Abbas Blue Island LLC" and "Abbas Columbus LLC" for the purpose of purchasing and holding real estate. (Dkt. 250 ¶¶ 11–12). Abbas states that Chojnacki and Mikosz told Abbas he was purchasing the Page Street property from a "mom-and-pop" seller, and that the Page Street property was fully leased and in good condition, which the Defendants dispute. (Dkt. 260 ¶ 60). In general, the extent to which the Page Street unit was leased, and what Defendants said about it, is a dispute of fact, as has been the case throughout the related cases.

Abbas had the Page property inspected by a third party, and the inspection report—detailing the condition and necessary repairs—was completed December 3, 2021. (Dkt. 250 ¶ 20). Abbas testified that after "skimm[ing] through" the report, he asked Mikosz and Chojnacki for their expert opinions as his representatives in the process, to which Mikosz said she thought the repairs would be insignificant, while Chojnacki said the property was in good condition. (Dkt. 250 ¶ 21). Abbas' real estate attorney informed him that due to the results of the inspection report, there were various code violations for the Page property that would need to be repaired once he took possession. (Dkt. 250 ¶ 22). Abbas also had the Page property appraised, a report that put the value of the Page property at $525,000, the agreed purchase price. (Dkt. 250 ¶ 23). (As in other cases, Plaintiff contends that the document should not count as an appraisal because it refers to nearby comp properties for its estimates despite the fact that the "sales comparison approach is [often seen as] the most reliable method for appraising the value." *Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, 2017 WL 1232973, at *6 (N.D. Ill. Apr. 4, 2017); nevertheless, the argument that the report should be set aside by a factfinder does not bear on a factual statement about the report's contents.)

Abbas closed on the Page property on February 3, 2022, without ever visiting it in person. (Dkt. 250 ¶ 25). Abbas purchased the property through his Abbas Blue Island LLC, and the seller was "Page Street Properties, LLC." (Dkt. 250 ¶ 25). Plaintiff does not dispute that "Page Street Properties LLC" is an entity owned by Kathleen Long, which was engaged in real estate investments relating to the Page property. (Dkt. 250 ¶¶ 9–10). Bank records show $482,483.66—the amount that Abbas paid for the property—entering TCF's bank account on February 7, then TCF wiring $150,000 to EJ Investments on February 8. (Dkt. 260 ¶¶ 64–65). Abbas hired Chojnacki's property management company, Mainstreet Property Management, to manage the Page property. (Dkt. 250 ¶ 26). He testified that once he took ownership of the property, the condition was worse than he expected. (Dkt. 250 ¶ 26). he admitted during his deposition that the inspection report he was provided prior to the closing was accurate, and that had he read it he would not have been surprised by the condition of the property. (Dkt. 250 ¶ 26). At the time of his deposition, Abbas testified that he still owned the Page property, which was fully occupied. (Dkt. 250 ¶ 27).

Shortly after their initial Zoom conference, on November 16, 2021, Chojnacki alerted Abbas to another investment opportunity; namely, the property located at 1017-1021 W. Columbus Dr., East Chicago, Indiana (the "Columbus" property). (Dkt. 250 ¶ 28). Abbas responded to Chojnacki that "this sounds like a great deal" and he "would be interested in talking all this over." (Dkt. 260 ¶ 68). Chojnacki responded to Abbas: "In short, we do everything. If a unit goes vacant, we will release it at max rate. We are hawks on rent collection. Any maintenance issues get routed directly to us and we handle it unless you specify that you want to be notified (We have a 24/7 call system for tenants). We send you documents routinely through dotloop for your signature (for example when we lease a new unit we need you to esign the lease, disclosures, etc.. – Unless you

give our management co a POA). I keep these things as hands off for you as I possible can, most of our clients are out of state and we just need them to have access to an email and occasionally we'll call/text you 😊." (Dkt. 260 ¶ 68).

The day after the Zoom call, and four days after purchasing the Page property, Abbas signed a contract to purchase the Columbus property in "as is" condition for $612,000. (Dkt. 250 ¶ 29). Like the Page property, Abbas had a third party inspect the Columbus property and issue a report on the repairs and condition; Abbas testified that he was told the repairs would be insignificant; although he could not recall who told him that, he guessed it was probably Mikosz. (Dkt. 250 ¶¶ 30–31). He testified that he had deferred to Mikosz and Chojnacki to tell him if there was anything significant he needed to know from the report and reported that they did not; when asked at his deposition about the part of the report that says the inspector could only inspect six of the ten units, Abbas testified he only found out about that many months later. (Dkt. 244, Ex. F, Abbas Dep. At 75:2-77:14).

Abbas then had the property appraised, putting the value of the Columbus property just above purchase price at $615,000. (Dkt. 250 ¶ 32). Abbas received a $12,000 closing credit for the Columbus property because the appraisal report identified Unit H as needing certain repairs. (Dkt. 250 ¶ 33). The appraisal report states that seven of the ten apartments are reportedly leased on a month-to-month basis, and the building is 70 percent occupied. (Dkt. 244, Ex. U, Appraisal Report for Columbus). (Plaintiff again disputes the validity of the appraisal report.)

Abbas closed on the Columbus property on January 31, 2022, without ever visiting it in person. (Dkt. 250 ¶ 35). Abbas hired Chojnacki's property management company, Mainstreet Property Management, to manage the Columbus property. (Dkt. 250 ¶ 36). He claims that once he took ownership of the property, the condition was worse than he expected. (Dkt. 250 ¶ 36).

Abbas purchased the Columbus property through his Abbas Blue Island LLC and the seller was "Grand Columbus EC LLC." (Dkt. 250 ¶ 35). In an April 21, 2021, email from Rixer that cc'ed Chojnacki, Rixer wrote: "Avon TCF National Holdings is an entity we created to wholesale this property. We do not want to tie the EJ name to a potential flip deal as we don't want to gain the reputation of being wholesalers and damage future business. The actual property will be held by a newly formed entity called "Grand Columbus EC LLC" which will be entirely held by TCF. I will update the terms sheet to reflect this." (Dkt. 260 ¶ 72; Dkt. 259 ¶ 72; Dkt. 253, Exhibit 30). The next day, in an email to Mikosz and Chojnacki and Phu Nguyen, another Chase agent, regarding an inspection of the East Chicago properties, Rixer wrote: "If an investor asks why a report was done you can tell them the owner was going through a refinance and the bank requested it OR CitiPoint inspection done on all properties we target which makes it easier for us to sell to investors, especially out of state. Or make up some other bullshit answer, it doesn't matter as long as you have something lined up." (Dkt. 260 ¶ 73; Dkt. 259 ¶ 73; Dkt. 253, Exhibit 73).

Abbas has not sold the Columbus property, but he has listed it on the market for $1,200,000, nearly twice what he paid for it in 2022. (Dkt. 250 ¶ 37). At the time that he prepared the listing, he estimated that it was fully occupied but for one or two units. (Dkt. 250 ¶ 37). He has received offers for the property, the highest being for $850,000, but he is still holding out for a higher price. (Dkt. 250 ¶ 37). Defendants contend that Abbas has no proof that the occupancy of the properties was ever misrepresented to him, which Abbas disputes. (Dkt. 250 ¶ 44). Defendants also contend that some of Abbas's alleged back-end damages are the normal costs of property ownership and wear-and-tear insufficiently tied to the transaction, which Plaintiff again disputes. (Dkt. 250 ¶¶ 45–46).

Now, Abbas seeks $307,000 for the undisputed difference for the difference in purchase price between what Abbas paid versus what Defendants paid, as well as $452,288.78 in back-end damages related to "undisclosed code violations, eviction costs, uninhabitable units, lost rents and undisclosed commissions." (Dkt. 260 ¶ 80). As throughout the related cases, Defendants take issue with the alleged back-end damages and allege that he has never provided a detailed explanation or calculation, which Plaintiff disputes without further citation to the record; in his responses to interrogatories asking him to compute his claimed damages in this case, Haynes referred Defendants to the same "Master Spreadsheet" that Plaintiff's counsel developed for all the related cases, as well as Haynes' entire production of documents. (Dkt. 250 ¶ 43). Further, Defendants contend that "there is no proof in the record that the conditions in the Columbus property remained the same from the first inspection to the second, nor is there evidence that any damage was not repaired prior to the second inspection being conducted," given that Abbas' evidence includes inspection reports from the Defendants' original purchases of the properties.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

Abbas alleges that the Chojnacki (as well as some of the Chojnacki entities) violated 18 U.S.C.§ 1962(c), (d), and that Long (as well as other Chojnacki entities) violated 18 U.S.C.§ 1962(d). (Dkt. 133 ¶¶ 125–145).[3] Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and

---

[33] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where some of the entities are only facing allegations under § 1962(d).

related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiffs paid for it. On this record, nothing indicates that Abbas did not get the benefit of his bargain.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Abbas's claims about back-end damages. Defendants contend that Abbas's claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010). Thus, Abbas's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction. The Chojnacki Defendants' other general attempts to argue that any bad acts were Mikosz' alone and that there was no enterprise falls flat on the same grounds as explained in the related cases. A full review of the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that the Chojnacki Defendants participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates. Defendants make much of the fact that the inspection reports and appraisal could have provided Abbas with more information regarding the properties. (*See, e.g.*, Dkt. 243 at 10). It is true that this information may weigh on a jury's assessment of the claims. It is also true that a real estate broker "holds himself out to people outside of his field as a professional

whose opinion as to matters within the area of his expertise—property value in the case of a broker—can be relied upon in making such decisions as contracting to buy or sell property," and a jury could find that the alleged scheme included using the Defendants' professional reputation to convince Abbas that there was little to worry about within the pages of the report. *See O'Connor v. Asperger Caraher LLC*, 2006 WL 3210498, at *5 (N.D. Ill. Nov. 6, 2006)

The Court next turns to Long's primary contention in support of her Motion: that the nexus between her and the enterprise is "solely based on the alleged relationship" with Chojnacki. (Dkt. 240-1 at 4–5). Yet this is a misstatement of the record. The Chojnacki Defendants put forth, and Plaintiff does not dispute, that Long owns "Page Street Properties LLC," which sold Abbas the Page property. (Dkt. 250 ¶¶ 9–10). Plaintiffs also put forth the Rixer email discussing how the Columbus property would be held by a newly formed entity called "Grand Columbus EC LLC" which, in turn, would be held by TCF. This Court cannot grant summary judgment on these facts.

Further, the analysis laid out in the related cases governs Long's contentions that the allegations of wire and mail fraud in the Amended Complaint are directed at other co-Defendants, not Long. (Dkt. 240-1 at 5). Under § 1962(d), that contention is irrelevant. Liability under that portion of the statute requires only that the defendant agree that "*someone* would commit at least two predicate acts to accomplish these goals" even if she herself does not. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis added). Of course, it is ultimately possible for a jury to find that the evidence showing that Long's financial involvement with regard to the property ownerships was entirely legitimate. Yet the argument that NO reasonable jury could find for Plaintiff on this claim is unpersuasive. Plaintiff's evidence, though shaky at times, could sufficiently tie the Long Defendants to the enterprise (even aside from the prior romantic relationship with Long and Chojnacki, which would be insufficient on its own to meet this

standard). The significant financial overlap, alleged lies regarding property ownership, entanglements disguising actual owners, and copious legal entities could allow a jury to infer the Long Defendants knowing participated in the scheme to saddle investors with misrepresented properties in order to make a quick buck.

As stated above, Plaintiffs cannot proceed on their "lost investment theory" and the Motions are granted with regard to the "front-end damages" undergirding that theory of injury. Drawing all inferences in favor of Abbas, however, the Motions for Summary Judgment on Count I are otherwise denied.

**I. State-Law Claims (Counts II–VI)**

Next, Chojnacki moves for summary judgment on Haynes' state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); negligent misrepresentation (Count V); and unjust enrichment (Count VI). (Dkt. 233).[4] Plaintiffs' responses on the issues offer scant case law, instead broadly regurgitating the generalized animating grievances of the amended complaint. Accordingly, most of the state law claims cannot survive this stage in the litigation.

**a. Count II: Common Law Fraud and Count V: Negligent Misrepresentation**

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074

[4] The Long Defendants also moved for summary judgment on Counts III, V, and VI seemingly out of an abundance of caution, as Long's name was mentioned in the text of an ICFA claim that otherwise only references Chojnacki and Mikosz, as well as a negligent misrepresentation claim that does not allege Long to have actually made any statements. (Dkt. 240-1 at 6–9). Indeed, Plaintiffs do not acknowledge Long in their defense of either claim. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude" a concession). Thus, the Long Defendants' Motion for Summary Judgment on Count III, V, and VI is also granted, to the extent it is not moot via the lack of proper pleading.

(7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

Starting with Count II: this case is different from many of the related cases in that Chojnacki was much more hands on with Abbas, his former classmate, than in the cases where Chojnacki never had pre-closing conversations with the plaintiffs about the properties they were purchasing. In pursuit of their summary judgment motion, the Chojnacki Defendants contend that Abbas claimed that he never read the reports. (Dkt. 243 at 13). This contention struggles. A jury could fairly find that Abbas's testimony was not that he "never" read the reports but rather, that he skimmed the reports and relied on his brokers to explain the information contained within in layman's terms.

Nonetheless, this case differs from *Malik* itself in a way that governs its result. The Chojnacki Defendants emphasize that Abbas had third-party inspections and appraisals done on both properties before he bought them. (Dkt. 243 at 13). The basic duty of care of a fraud victim is breached when the victim closes his eyes to a risk that is obvious or known. *Sain v. Nagel*, 997 F. Supp. 1002, 1014 (N.D. Ill. 1998). While it is of course also true that a "victim of fraud need not dig beneath apparently adequate assurances," *id.*, it "is [also] an elementary principle of contract law that a party may not enter into a transaction with its eyes closed to available

information and then charge that it has been deceived by another" in a context where the complaining party "*had the opportunity to read the terms of the lease that were explicitly different from the alleged oral representations*." *Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 574-75 (7th Cir. 2001) (citation modified) (emphasis added). Plaintiff's Response makes zero mention of these reports, and Plaintiff's citations to the 56.1 statements do not sufficiently resolve it. Indeed, beyond conclusory and unspecified statements about Chojnacki's alleged fraud, Plaintiff points only to an interaction that Chojnacki had with Redfin on February 10, 2022, regarding the Page Property, but Abbas could not have relied on any related representation as he had closed on the Page property a week prior on February 3. (Dkt. 250 ¶ 25).

Plaintiff had a few legal objections to the reports' validity incorrectly put forth in the 56.1 statements, but that is insufficient at this stage of litigation. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). It is neither required nor appropriate for the Court to "sift through the record and make [the] case for him." *See 5443 Suffield Terrace*, 607 F.3d at 510. Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count II.

Returning briefly to the negligent misrepresentation claim:[5] Plaintiff did not specifically allege a duty in the Amended Complaint. (Dkt. 133 at 27). Nor does Plaintiff meaningfully address

---

[5] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases).

the Defendants' arguments as to negligent misrepresentation in the Response with a single citation to case law. (Dkt. 254 at 21–22).

Ultimately, though, what dooms Plaintiff's claim here is the same lack of prosecution that impedes the common law fraud claim. After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Haynes does not make the requisite arguments here, and the court will not do it for him. *See Little v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case").

**b. Count III: ICFA**

In Count III, Plaintiff alleged that Chojnacki violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead . . . that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quotation marks omitted). "The Illinois Consumer Fraud Act affords broader protection to consumers than the cause of action available under common-law fraud." *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024)*; Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Illinois 1994) ("[T]he intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations."). "Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common law fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 203 (Ill. App. 2008) (citation omitted).

" 'Intent' under the Act means 'that the defendant intends for the plaintiff to rely on the deception' rather than 'the defendant's intent to deceive' under common-law fraud." *Letoski*, 753 F. Supp. 3d at 664. Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Benson*, 944 F.3d at 646. It is unfair if it offends public policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

A buyer must prove either 1) "the buyer would have acted differently knowing the information" or the act "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203 (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 584 (Illinois 1996)). "Furthermore, a plaintiff's actual reliance is not required, but a plaintiff must show that defendant's consumer fraud proximately caused their injury." *Id.*

While Abbas's common-law fraud claim cannot proceed to trial, under the ICFA's lesser standard, Abbas's access to the inspection report and appraisals might not deter a jury from finding that Chojnacki's behavior was designed to induce Abbas's reliance on the inefficient and old-school seller narrative to make the investment look more guaranteed to in turn secure a future profit on properties that Defendants had not yet purchased themselves. In Response, Plaintiff points to some behavior that is perfectly legal, such as identifying longtime owners and offering them opportunities to sell. (Dkt. 254 at 22). But Plaintiff also has presented evidence of a potential scheme to convince sellers of a bargain real estate deal that simultaneously provided Defendants with a near-guaranteed investment opportunity. (*Id.*) A jury could find that the scheme alleviated some of the traditional risks of real estate investments for Defendants—namely, the ability to flip the property for a profit—by ensuring a buyer was ready to go on the flip before Defendants even

finalized their initial purchase. On this record, it remains disputed whether Chojnacki's representations and conduct "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203.

Defendants also contend that Abbas has presented no evidence of damages because he has not sufficiently tied damages to this part of his claim. (Dkt. 246 at 15). Yet Abbas has offered some evidence on the alleged six-figure damages, and it is up to the jury to assess the validity, if any, of that sum. In analyzing a claim under the Illinois statute, courts consider "the totality of the information made available to the plaintiff." *Benson*, 944 F.3d at 646 (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). That inquiry, by its definition, will peer beyond the singular "seller's identity" quotation to assess the full picture available to Abbas in his dealings with Defendants.

**c. Count IV: Illinois Real Estate License Act**

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

The Chojnacki Defendants pivoted from their standard arguments given the idiosyncratic nature of this case compared to the other related cases—namely, the direct relationship between Chojnacki himself and Abbas. Defendants acknowledge that Abbas was at least "a customer," and thus, under the Act, Chojnacki had a duty to refrain from supplying him false information. (Dkt. 243 at 15). Instead, they focus on Abbas's testimony: namely, that he stated he did not want to pay a premium but, in Defendants' telling, "critically absent from his testimony was an affirmative statement that he would not have gone through with the transactions had he known." (*Id.*)

In doing so, they cite a bankruptcy case that discusses IRELA's requirement that a licensee representing a client should disclose material facts of which the licensee has actual knowledge, held that the licensee at issue had withheld a material fact in hiding her ownership of the property at issue, discussed the legal standards applicable to the fiduciary duty, and ultimately held that the claim ultimately failed because there was no evidence that the buyer would have pulled out of the deal if the licensee had admitted she was the seller. *In re Bastanipour*, 553 B.R. 111, 120 (Bankr. N.D. Ill. 2016).

Rather than attempt to distinguish this case or even in any way dispute Defendants' arguments about Abbas's lack of sufficient testimony, Plaintiff *once again* recites the general theory of the case with conclusory assessments, declaring the arguments "without merit" and following that with an excerpt from a expert report and general references to dozens of exhibits without citation, the majority of their 56.1 statement, and zero references to case law. (Dkt. 254). Mere conclusory assertions, whether made in pleadings or in affidavits, are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

"Judges are not like pigs, hunting for truffles buried in" the record. *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002). Thus, the Court will not "address those arguments which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov. 1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)); *United States v. Anzaldi*, 2013 WL 393326, at *5 (N.D. Ill. Jan. 31, 2013) ("the Court refuses to address nonsensical arguments") (citing *Morton v. Greer,* 61 F.3d 906, 906 (7th Cir. 1995) (stating that briefs which contain no identifiable argument will be dismissed)); *Schramm L. Grp., LLC, v. Pitney Bowes Inc.*, 2026 WL 636820, at *2 (N.D. Ill. Mar. 6, 2026) ("The Court needn't consider . . . 'underdeveloped, conclusory, and undeveloped' argument[s].") (cleaned up) (quoting *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)); *United States v. Vance*, 2022 WL 1831138, at *1 (7th Cir. June 3, 2022) ("courts need not address arguments . . . that are 'too weak to require discussion' ") (quoting *United States v. Joiner*, 988 F.3d 993, 995 (7th Cir. 2021)); *Smith,* 910 F.2d at 1470–71 (the Court "cannot be called upon to supply legal research and organization to flesh out a party's arguments"). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count IV.

**d. Count VI: Unjust Enrichment**

That leaves the final state-law claim: Count VI: unjust enrichment. Both sets of Defendants moved for summary judgment on Count VI. As they did in *Stafford* and *Chen*, Plaintiffs' attorneys once again incorrectly claim that Defendants' argument "relies entirely" on *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018), a case featured in the Long Defendants' brief (Dkt. 240-1 at 11), without acknowledging the case law in the Chojnacki Defendants' brief (Dkt. 243 at 17). Even so, Plaintiffs' contentions are misinformed. As this Court has already spelled out in *Malik*, Illinois law does not consider unjust enrichment an independent

cause of action. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (finding no standalone claim for unjust enrichment under Illinois law); *Flores v. Aon Corp.*, 242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)); *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 325 (7th Cir. 2021) ("A successful showing of fraudulent inducement invalidates a contract, clearing the way for an unjust enrichment claim").

To the extent that the unjust enrichment claim is premised on the ICFA, the unjust enrichment claim can survive dismissal with regard to the Chojnacki Defendants. *See id.* at 741–42; *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."). The unjust enrichment claim is barred as a tag-on to the alternative state law claims for the Chojnacki Defendants. Similarly, because there are no alternative state law claims as to Defendant Long, her Motions is granted with regard to Count VI. *See Mashallah, Inc.*, 20 F.4th at 324. ("To the extent that the unjust enrichment claim is premised on the ICFA or [common-law fraud] claims, the unjust enrichment claim cannot survive the proper dismissal of those matters.").

## **CONCLUSION**

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment [242] and Long's Motion [240] are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants Long's Motion on Counts III, V, and VI. The Court also

grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026